NEW ENGLAND MUTUAL LIFE IN-
SURANCE COMPANY, a Massachu-
setts corporation, Plaintiff,

v.

Carl H. LAUFFER, etc., et al.,
Defendants.

PASADENA CHRISTIAN SCHOOL, INC.,
Plaintiff and Cross-Defendant,

v.

PRUDENTIAL INSURANCE COMPANY
OF AMERICA, Defendant and Cross-
Complainant.

Civ. Nos. 478–61, 171–61.

United States District Court
S. D. California,
Central Division.

March 11, 1963.

**92**

Meserve, Mumper & Hughes, Los Angeles, Cal., for plaintiff New England Mutual Life Ins. Co.

Thomas S. Bunn, Jr., Wiley D. Bunn, Los Angeles, Cal., for plaintiff and cross-defendant Pasadena Christian School, Inc.

Adams, Duque & Hazeltine, Los Angeles, Cal., for defendant and cross-complainant Prudential Ins. Co.

Newlin, Tackabury & Johnston, Los Angeles, Cal., for defendants Carl H. Lauffer, individually and as guardian of estate of Charles Henry Lauffer, a minor, Charles Henry Lauffer and Union Trust Co.

Watson, Hart, Mieras & Cutler, Los Angeles, Cal., for defendants and cross-defendants, Stephen Lazarian and Eldon Eby.

BYRNE, District Judge.

These are actions under the Federal Interpleader Act.[1] Both actions involve the same or related facts and are here consolidated for trial.

These actions require the determination of the proper recipient of the proceeds of two life insurance policies on the life of Ruth E. Laboshin, née Ruth E. Lauffer. One of the policies was issued by Prudential Life Insurance Co. ("Prudential"), and the other by New England Mutual Life Insurance Co. ("New England Mutual").

In each case the claimants to the proceeds of the policy are, on the one side, Carl H. Lauffer, individually and as guardian of the Estate of Charles Henry Lauffer, a minor, Charles Henry Lauffer, and Union Trust Company. This side is sometimes hereinafter referred to as the "prior beneficiaries". The claimants on the other side are Pasadena Christian School, Inc., and Eldon Eby and Stephen Lazarian, co-executors of the Estate of Ruth E. Laboshin, deceased.

It is the contention of the prior beneficiaries that there was no effective change of beneficiaries of the policies under the applicable law. It is the contention of Pasadena Christian School that there was an effective change designating the school as beneficiary of the policies.

The Prudential policy contains the following provision:

"Change of Beneficiary—If the right to change the Beneficiary has been reserved, the Insured may at any time

---

1. 28 U.S.C.A. §§ 1335, 1397 and 2361. Rule 22, Fed.R.Civ.P.

while this policy is in force, by written notice to the Company at its Home Office, change the Beneficiary or Beneficiaries under this policy, such change to be subject to the rights of any previous assignee and to become effective only when a provision to that effect is endorsed on or attached to the policy by the Company, whereupon all rights of the former beneficiary shall cease."

The New England mutual policy provides:

"No change of Beneficiary shall take effect until endorsed hereon by the Company."

No endorsement for the purported change of beneficiary appears on either of the subject insurance policies.

Ruth Lauffer died in California on or about November 12, 1960.

The Prudential policy had been issued to Ruth Lauffer in 1938, and on May 20, 1941, a rider form was attached to that policy providing in essence that interest payments should be made to Carl H. Lauffer and Charles H. Lauffer, the nephew of Ruth Lauffer, in equal shares during their respective lives and on the death of either of them a one-half share of the policy proceeds were to be paid to Union Trust Company of St. Petersburg, Florida, as trustee under a trust agreement dated April 24, 1941, and executed by Charles A. Lauffer, Ruth Lauffer's father, as Trustor, and Ruth E. Lauffer of Polk County, Florida, and Union Trust Company, as trustees.

The New England Mutual policy had been issued to Ruth Lauffer in 1938, and by a special settlement request dated September 29, 1941, the insured, Ruth Lauffer, instructed that the proceeds of the policy be retained by New England Mutual at her death under an interest option, one-half for the benefit of Carl H. Lauffer and one-half for the benefit of Charles Henry Lauffer, each of whom was to receive interest payments on his share of the policy during his lifetime. On the death of Carl H. Lauffer and Charles Henry Lauffer, their one-half shares of policy proceeds were to be paid to Union Trust Company, as Trustee under the trust agreement referred to above. This special settlement request was endorsed on the policy on October 2, 1941.

The trust agreement of April 24, 1941, was executed in Florida, and pursuant to that agreement each of the subject policies was itself deposited with the Union Trust Company and remained in its possession until after the death of the insured.

The trust agreement pursuant to which Ruth Lauffer deposited the policies with Union Trust Company provided as follows:

"Ruth Emily Lauffer agrees to leave said policies with the corporate Trustee for safekeeping at all times, and the corporate Trustee hereby acknowledges their receipt and is charged with their safekeeping. Ruth Emily Lauffer agrees not to change the beneficiary under said policies, or any of them, without the consent of Carl Henry Lauffer and, if any such change of beneficiary is made without his consent, the Trustees shall thereafter, annually during the life of Ruth Emily Lauffer, withhold from income and add to the corpus of this trust an amount equal to the annual premium paid on each and every policy on which the beneficiary was so changed for the year last preceding the date of such change."

The trust agreement reveals that nowhere did Ruth E. Lauffer entrust the ownership of the subject insurance policies to the Union Trust Company or to anyone else. Rather Charles A. Lauffer entrusted certain securities which became part of the trust estate. The income from the trust estate was to be used to pay all premiums on the insurance policies on the life of Ruth E. Lauffer. Although Ruth E. Lauffer agreed not to change the beneficiary under those policies without the consent of Carl Henry Lauffer and that if such change be made without his consent, the trustees should thereafter withhold from income and add to corpus the amount of the annual premium to be paid annually on

each policy on which the beneficiary was so changed, this agreement under orthodox analysis did not transfer ownership of the policies to the Union Trust Company. Legal title appears to have remained in Ruth E. Lauffer, and with it the power to exercise the incident of ownership of changing the beneficiaries remained in Ruth E. Lauffer. Thus Ruth E. Lauffer had the *power* to change the beneficiaries of both the Prudential and the New England Mutual policies without anybody's consent.

Ruth Lauffer executed a document in which she instructed Union Trust Co. to change the beneficiary designations on the New England Mutual and the Prudential policies. This document stated: "The primary beneficiary is to be the Pasadena Christian School, Inc., located at 1464 North Garfield, Pasadena, California. The method of payment shall be lump sum. If for any reason these proceeds cannot be paid within twelve months to the primary beneficiary, then my estate shall be named as secondary beneficiary." It appears that this instruction was signed by the insured on the date it bears, Oct. 13, 1960. Mr. Mieras, attorney for the insured, mailed the instruction to the Union Trust Company along with a letter written by Mieras which stated: "In view of the fact that we do not have the policies to initiate these beneficiary changes direct with the insurance companies involved, we are forwarding her letter of instructions to you and trust that you as Trustee can accomplish the same. This letter was dated October 19, 1960. The letter and instruction were received by Mr. Cohoe, a trust officer of Union Trust Company, on October 21, 1960. There then followed correspondence between Cohoe and Mieras.

Although *there was no written notice to the insurance companies of the attempted change of beneficiaries, and no endorsement of any change of beneficiaries on the policies,* Pasadena Christian School contends that the insured did all that was within her power to change the beneficiaries before her death and that

consequently the sending of the written instruction to the Union Trust Company, along with Mieras' letter, should be sufficient in contemplation of law to change the beneficiaries. It is argued that *if* Union Trust Company had sent the policies and forwarded the instruction to the respective insurance companies, the changes of beneficiary would have been effective immediately on receipt by the insurance companies of the instruction and the policies themselves even if the changes of beneficiary were not then endorsed on the policies, all this because of a substantial compliance rule which is followed in some jurisdictions. The argument is made that under this rule there need not be endorsement of the change of beneficiaries on the policy, as required by the strict letter of the policy provisions, where the policy is in the hands of a prior beneficiary who *refuses* to surrender the policies. Pasadena Christian School contends that the substantial compliance rule is applicable herein, and that the insured did enough to change the beneficiaries effectively under that rule.

The prior beneficiaries contend that under the applicable law, strict compliance with policy provisions is required to complete the change of beneficiary, and that since there was no endorsement of any change of beneficiaries on the policies, as required by policy provisions, there was no effective change of beneficiaries. They also contend that even if the substantial compliance rule is applicable, there was no effective change of beneficiaries.

Carl H. Lauffer is a citizen and resident of Mississippi. Charles Henry Lauffer is a citizen and resident of Mississippi. Union Trust Company is a Florida corporation with its office and principal place of business in Florida. Pasadena Christian School is a California corporation with its principal office in the County of Los Angeles, California. Thus there are two or more adverse claimants who are citizens of different states.

In actions in interpleader based upon the diversity of citizenship jurisdiction of the federal courts, the federal court must apply the conflict of laws rules of the state in which it is sitting. See Griffin v. McCoach, 313 U.S. 498, 61 S.Ct. 1023, 85 L.Ed. 1481 (1941); Williams v. McFerrin, 242 F.2d 53, 55 (5th Cir., 1957); Old Colony Insurance Co. v. Lampert, 129 F.Supp. 545, 547 (D.N.J. 1955), aff'd, 3 Cir., 227 F.2d 520; Klaxon Co. v. Stentor Electric Mfg. Co., 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). Consequently the California conflict of laws rules must be applied in the instant action.

The question of whether or not the insured by her acts accomplished a change in the beneficiaries of the policies seems to be classifiable *primarily* as a question of interpretation of the provisions of those policies which relate to change of beneficiaries, and determining the legal effect of those provisions. Similarly, whether a substantial compliance doctrine or a strict compliance doctrine governs the change of beneficiary provisions of the policies seems classifiable primarily as a question of interpretation of those policy provisions, and determining their legal effect. As used here "interpretation," does not merely mean the actual interpretation of the language used (which depends upon the intention of the parties and is generally the same everywhere), but means the determination of the legal effect of those provisions. "Interpretation" questions are thus in contradistinction to questions of formation and essential validity. Some commentators may refer to questions of interpreting or determining the legal effect of contract provisions as questions of performance. In either event, the rule should be the same.

Pasadena Christian School contends that since the Prudential policy provides that the proceeds of the policy are payable at the home office of the company at Newark, New Jersey, its interpretation is governed by the law of New Jersey, that being the "place of performance." The School asserts that since the New England Mutual policy provides that the proceeds of the policy are payable at the home office of the company at Boston, Massachusetts, its interpretation is governed by the law of Massachusetts, that being the "place of performance."

The prior beneficiaries contend that both policies are to be interpreted according to the law of Florida, that being the place of performance in that most of the premiums on both of the policies were paid to Florida agents of the insurance companies. The prior beneficiaries also contend that the law of Florida should apply to interpretation of the policies even if the applicable law is the law of the state in which the contracts were made.

Indeed, the competing laws in resolving the conflict of laws question are the law of the state of performance and the law of the state of the making of the contracts.

Section 1646 of the California Civil Code provides:

"A contract is to be interpreted according to the law and usage of the place where it is to be performed; or, if it does not indicate a place of performance, according to the law and usage of the place where it is made."

Nothing but a bewildering confusion would result from any attempt to reconcile all of the California cases applying this Section of the Civil Code to conflicts of law questions involving insurance contracts wherein it is provided that premiums are to be paid at the home office of the insurance company or to an authorized agent of the company, and the contract is made in State A, but most of the premiums are paid in State B.

The Prudential policy provides that: "Premiums are payable at the Home Office of the company, but may be paid to an authorized agent of the company on or before the dates when due * * " The New England Mutual policy provides that: "Premiums shall be payable in advance at the Home Office, or may

be paid to an agent of the company upon delivery of a receipt signed by the secretary and countersigned by a General Agent or Manager * * *" All the premiums on the Prudential policy were paid to Prudential's Miami, Florida, Ordinary Agency. Premium receipts for payments upon the Prudential policy were issued in Florida. According to the uncontradicted testimony of Mr. Arthur, an insurance broker, who attended to the completion of the application for the New England Mutual policy, he received the first premium payment on the policy in Florida from Ruth Lauffer's father and then turned it over to Mr. Folsom, the Florida manager or general agent of the New England Mutual Life Insurance Company. It seems correct to infer that prior to the creation of the trust on April 24, 1941, the premiums on the New England Mutual policy were paid in Florida. This is so because the parties stipulated that: "As to the question of payment of premiums on Policy No. 987354 issued by New England Mutual Life Insurance Company on the life of Ruth E. Lauffer, the Tampa, Florida, agency of said Company was the agency of record during the entire life of the policy.

"The practice of New England Mutual Life Insurance Company regarding premium collections is and was at all times material in the * * * action as follows:

"Premium notices are prepared in the Home Office in Boston and are forwarded to the agency of record in advance of the premium due date. The agency of record then mails the premium notice to the policy holder. Premium payments are received by the agency of record from the policy holder. The premium notice always instructs the policyholder to make payment to the agency of record."

Furthermore, the uncontradicted evidence is that after the creation of the trust, on April 24, 1941, all the premiums on both policies were paid by Union Trust Company of St. Petersburg, Flori-da, to the Florida agency offices of the two insurance companies.

It appears that the negotiations for the purchase of the policies were conducted exclusively through Florida agents, and the policies were delivered in Florida and were received by Mr. Arthur, the agent, in Florida from Florida agents of the insurance companies. It appears that Arthur delivered the policies to Dr. Lauffer, the insured's father, either in St. Petersburg or Tampa, Florida. He so testified as to the New England Mutual policy. As to the Prudential policy, this seems inferable from his testimony that all the negotiations were in Florida, that he received the policies in Florida from the local manager of the Prudential Company. Moreover, he directly testified that he delivered the Prudential policy to Dr. Lauffer in person.

The School claims that the insured was attending college in Salisbury, North Carolina, at the time the policies were issued in the Spring of 1938. Indeed, Carl Lauffer testified that the insured did attend Catawba College in Salisbury, North Carolina, but that he was not sure when. It appears that the medical examination for the New England policy was conducted in Salisbury, North Carolina, for Part II of the application for that policy was signed at Salisbury, North Carolina, by Ruth E. Lauffer apparently on May 11, 1938. Nevertheless, in that application, Part I, it is stated that Ruth E. Lauffer's residence was at 930, 14th Ave. No. St. Petersburg, Florida.

The medical examination for the Prudential policy also appears to have taken place in Salisbury, North Carolina. However, the Prudential policy application for insurance states that the address to which communications are to be sent is 14th Ave. North, St. Petersburg, Fla., and the "Agent's statement" accompanying said application states that the address of the person to be insured is again 930, 14th St., North, St. Petersburg, Florida.

Mr. Arthur testified that in January or February of 1938, he discussed insurance with Dr. Lauffer at his home, in St. Petersburg, and that his son Carl H. Lauffer and his daughter, Ruth E. Lauffer, were present at these discussions. Arthur also testified that Ruth E. Lauffer was present there when the applications were "completed" on the policies on her life. Carl Lauffer testified that Ruth E. Lauffer lived with her family, including her father, Dr. Lauffer, at 930–14th Ave. N., St. Petersburg, Florida, during the year preceding June 1, 1938.

■ Thus even though it seems that Ruth E. Lauffer was in Salisbury, North Carolina, during at least part of the month of May, in attendance at Catawba college, nevertheless it appears by the weight of the evidence that she was domiciled in Florida at all times in which something was being done to obtain these policies of insurance on her life, at the time in which the policies were applied for, and at the time in which the policies were delivered in Florida. Domicile means (1) physical presence in the State with (2) the intent to remain indefinitely, or at least the absence of an intention of residing anywhere else. And one's prior domicile continues until he acquires a new one. It appears from the evidence that Ruth E. Lauffer did not acquire a new domicile during the spring of 1938. It appears that she intended to continue to make her abode with her family in Florida.

■ Consequently, Ruth E. Lauffer was domiciled in Florida when both the Prudential and the New England Mutual policies were applied for and were delivered in Florida.

■ The general rule of law is that the place of contracting is the place where the last event necessary to make a contract occurs. See Restatement of Conflict of Laws, Sections 312, 313, 315, 318, and cases cited under California Annotations to Restatement of Conflict of Laws, Section 311; 11 Cal.Jur.2d Conflict of Laws, Section 68; Prudential

Insurance Co. of America v. Heyn, 139 F.Supp. 602 (S.D.Cal.1956). That is the general California rule. See 11 Cal.Jur. 2d Conflict of Laws, Sec. 68.

It is frequently very difficult to determine where the last event necessary to make a valid contract occurs.

■ The insurance policies with the applications attached are construed together as they constitute one contract. See Prudential Insurance Co. of America v. Heyn, 139 F.Supp. 602 (S.D.Cal. 1956); Boyer v. United States Fidelity & Guaranty Co., 206 Cal. 273, 274 P. 57.

■ In the application for the Prudential policy (attached to that policy) it is provided that unless the first full premium is paid at the time of making the application, the policy should take effect only when the Company approved the policy and the insured received it and paid the first premium while in good health. It is also provided that if at the time of signing the application the first full premium is paid, the insurance shall take effect as of the date of the application. Since the first premiums on the Prudential policy were paid in Florida, the last event necessary to make the contract occurred in Florida, consequently the Prudential policy was made in Florida. This is a sound result in view of the fact that the application was made from that State, the negotiations were conducted with an insurance broker in that state, and the policy was delivered in Florida.

■ The New England Mutual policy application (attached to that policy) provides that the insurance applied for shall not take effect unless and until the application is approved by the Company at its Home Office and the first premium is paid while the insured is in good health; provided, however, that if such premium is paid with the application and is so stated therein, the Insurance shall take effect as stipulated in a conditional receipt issued therefor. Since it appears that the first premium on the policy was paid in Florida, it seems correct to con-

clude that the last event necessary to make the contract occurred in Florida. Again, this result seems especially sound where the application was made from Florida, the negotiations were conducted with an insurance broker in Florida, and the policy was delivered in Florida.

The question now presented is what law does California apply to determine the legal construction and effect of an insurance policy which provides that the proceeds are payable at the home office in State A, that the premiums are payable at the home office in State A or to an authorized agent, and subsequently the premiums are paid in State B, and the contract was in fact made in State B.

Section 1646 of the Civil Code of California has been generally applied to answer this type of question. See Baekgaard v. Carreiro, 237 F.2d 459, 464 (9th Cir., 1956).

In Blair v. New York Life Ins. Co., 40 Cal.App.2d 494, 104 P.2d 1075 (1940), the court applied Section 1646 to what it regarded as a question of interpretation of an insurance policy. The court said that where the life policy, which provided for disability benefits, was issued in Washington, and the policy provided that premiums could be paid at the insurer's home office in New York, or to an authorized agent, and the parties to the contract did not specify that the law of New York or Washington should prevail, and the insured paid premiums in Washington while residing in that state, the performance of the contract was partly in New York and partly in Washington, and the law of the place where the contract was made would generally prevail as to interpreting the provisions of the policy. However, the court said that the intention of the parties was very important in deciding the choice of law question. The court went on to hold that where the performance of the contract for disability insurance was partly in New York and partly in Washington, the insurer "waived" the law of Washington as controlling in the insured's ac-

tion on contract in California courts by the insurer's continuous acceptance of premiums from California, to which state the insured moved after issuance of the policy, and by the insurer's payment of disability benefits in California, and making a loan to the insured on security of the value of the policy without surrender thereof during the period that the insured lived in California. So the court applied California law to the interpretation of the contract.

The Blair case was followed in Braun v. New York Life Ins. Co., 46 Cal.App.2d 335, 115 P.2d 880 (1941), where the court stated that there was not a single material fact to distinguish the Blair case.

Baekgaard v. Carreiro, 237 F.2d 459 (9th Cir., 1956), applied Section 1646 to a conflicts question concerning what was clearly a question of interpretation. The court cited the Braun and the Blair cases, and seemed to indicate that where there are a number of acts of performance under a contract, the court should apply the law of the state of the greater number of performances rather than merely fall back on the law of the state in which the contract was made. In Baekgaard, three insurance policies were issued by a Massachusetts corporation and the benefits or face amounts were payable at Boston, Mass. The policies provided that premiums were payable either "at the Home Office, or they may be paid to an agent of the Company * * *". Apparently two of the policies were applied for and delivered in Honolulu, Hawaii, in 1932, and the other policy was applied for and delivered in California in 1942 after the insured had moved to California. Premiums were paid on all three policies to an agent of the company in San Francisco for a number of years, and the policies were also serviced at the San Francisco office of the company. The court rejected the contention that *the* place of performance was Boston, Massachusetts, the place where the face amount of the policy was to be paid. The court endorsed the view

that the repeated payment of premiums constitutes the greater number of performances of the terms of such insurance policies.

The rationale set forth in Blair, that one waives the law of the state of making by accepting premiums and engaging in other acts of performance in another state seems to be a peculiar way of saying that the courts will try to do justice in the particular case and apply the law that the parties probably would have intended to have govern the substance of their rights and obligations. Logically, it would seem that this points to the state of making in most instances. However, in multistate contracts, one party frequently has little connection with the state in which the insurance company may arrange to have the contract made, and consequently the court may look to the state where the insured pays the premiums on the policy. In spite of Baekgaard, it is hard to say that California has a hard and fast black letter rule on this precise point. The closest thing to such a rule is the indication from the cases that the insurance contract should be interpreted according to the law of the state in which the most performance takes place, and that the payment of premiums constitutes the greater number of performances. In view of the underlying reasons for such a rule, it would seem more logical to hold that where a contract of insurance is performable in several states or an indefinite number of states, the contract should be interpreted according to the law of the state in which it was made at least if the insured was domiciled in that state at the time of contracting and applied for the policy in that state and did not agree that the contract should be governed by the law of some other state with an important interest in providing the rule.

■ An extended discussion of this issue is not necessary in view of the finding that the premiums on both the Prudential and the New England Mutual policies were paid in Florida to Florida agents of the insurance companies; and in view of the California "rule" as set forth in Blair, Braun, and Baekgaard, Florida law applies since that is the place of the greater number of performances. In accordance with the underlying spirit of the California cases, Florida law should apply to interpreting the policies because that is the law that the parties probably would have intended to determine the nature and substance of their contract rights, the contracts having been *made* in Florida.

■ The acts of the insured were ineffective to change the beneficiaries under the law of the state of Florida. Of course, the rights of the prior beneficiaries must here be regarded as having become vested at the time of the death of the insured.

■ Florida follows a rule of strict compliance with provisions for change of beneficiary. Where an insured had forwarded a request for change of beneficiaries and his policy to the home office of the insurer, but died before the change could be endorsed upon the policy by the insurer, it was held in Sheppard v. Crowley, 61 Fla. 735, 55 So. 841, that upon his death his estate immediately became vested with the policy, since the change of beneficiaries could not be said to have been effected. The policy there provided that the change was to take effect upon the endorsement of the same on the contract by the insurer. The court said:

"We do not think this question controlled by the principle that if the assured has taken all the steps necessary, and otherwise done all in his power, to effect a change of beneficiary, and all that remains to be done is some purely ministerial duty on the part of the officers of the society, the change will be regarded as complete. The act here required to be done by the company not being a mere ministerial act, the principle just stated does not apply. * * "

In Warren v. Prudential Ins. Co., 138 Fla. 443, 189 So. 412 (1939) the court held that failure to give the required notice resulted in no effective change of

beneficiary. In Gerstel v. Arens, 143 Fla. 20, 196 So. 616 (1940), the court reiterated that Florida has consistently followed a rule requiring strict compliance with the provisions in the policy for change of beneficiary. See also Miller v. Gulf Life Ins. Co., 152 Fla. 221, 12 So.2d 127 (1943).

Part of the rationale of the decision in the leading Florida case of Sheppard v. Crowley, supra, was that the endorsement of the change of beneficiary on the policy by the insurance company was not a mere ministerial act. The policy involved in that case provided: "This contract is issued with the express understanding that the purchaser may from time to time * * * change the beneficiary or beneficiaries by filing with the society a written request duly acknowledged, accompanied by this contract, such change to take effect upon the indorsement of the same on this contract by the society, * * *." Since the endorsement requirement is substantially identical in the policies involved in the instant action with the endorsement requirement in the policy involved in Sheppard v. Crowley, Florida law regards the endorsement requirements in the policies involved in the instant action as non-ministerial. Furthermore, entirely apart from the matter of endorsement of change of beneficiaries, there was no notice of change of beneficiaries sent to the insurance companies during the lifetime of the insured, Ruth E. Laboshin.

The School argues that there is no Florida case which has ruled on the question of whether something less than strict compliance with change of beneficiary provisions may suffice to change the beneficiaries where the policy is not in the possession of the insured but is in the possession of a prior beneficiary who fails to or refuses to surrender the policy. Since Florida has consistently stated in numerous cases that it requires strict compliance with requirements for change of beneficiaries including the requirement of endorsement of change on the face of the policy by the insurance company, it seems likely that no Florida court would say that anything less than strict compliance could change the beneficiaries even in the case where the policies are in the possession of a prior beneficiary. If the court wished to give relief to the purported substituted beneficiaries in that situation in Florida, it would not change the affirmative rule of strict compliance, because that would upset a good deal of well-considered precedent. So if a Florida court would decide to give relief in such a case it would with almost absolute certainty be on some theory of estoppel against the prior beneficiary without disturbing the affirmative strict compliance rule which is firmly embedded in that state's jurisprudence.

There are no Florida cases which deal with estoppel to deny effectiveness of change of beneficiary in accordance with the change of beneficiary requirements against a prior beneficiary who refuses to surrender, or fails to surrender the policy. In the cases, the issue of estoppel is frequently merged with the issue of change of beneficiary where the real conflict is between the prior beneficiaries and the substituted beneficiaries.

Pasadena Christian School contends that the Union Trust Company had a duty to act promptly upon the instructions it received and to forward the instructions, or an appropriate instruction, and the policies themselves to the respective insurance companies for endorsement of the change of beneficiaries, and that consequently Union Trust Company should be estopped to deny the effectiveness of the change of beneficiaries.

It is still an open question as to whether the Florida courts would apply any sort of an estoppel doctrine at all in change of beneficiary cases where there was not a strict compliance with the change of beneficiary requirements of the insurance policies. There is an issue as to whether a different choice of law should be made on the issue of possible

estoppel. Since the cases merge the estoppel issue with the change of beneficiary issue, both would, at first blush, appear to be controlled by the same law, the law governing the legal effect of the insurance contracts. A subtle issue not argued by the parties is that possibly estoppel in this context should be subject to the law of some other state, such as the state in which the acts of estoppel occurred or the state in which these acts affected the most people. Nevertheless, it is apparent that under any view of "estoppel" the requisite elements of the doctrine are not here present.

In 46 C.J.S. Insurance § 1175c (2), it is stated:

"The mode prescribed by a life insurance policy for changing the beneficiary generally must be followed, but in equity the change will be regarded as completed where the insured has done all that he could to comply with the terms of the policy. * * *

"On the principle that equity regards as done that which ought to be done, the courts will give effect to the intention of insured by holding that the change of beneficiary has been accomplished where he has done all that he could to comply with the provisions of the policy, as where he sent a proper written notice or request to the home office of the company but was unable to send the policy by reason of circumstances beyond his control, as where it has been lost, or was in the possession of another person who refused to surrender it or was otherwise inaccessible, or where he sent both the policy and a proper written notice or request and all that remained to be done were certain formal and ministerial acts on the part of the company, such as the indorsement of the change on the policy, and these acts were either not done at all or were done after the death of insured. *Of course the rule is not applicable where insured has not done all that he reasonably could to meet the conditions of the policy.*" (Emphasis added)

As pointed out supra, Florida does not regard endorsement of the change on the policies as ministerial, and has adopted a rule of strict compliance generally.

Nevertheless, it is not impossible that Florida would follow the general rule as quoted from C.J.S. supra where a prior beneficiary wrongfully refused to surrender the policy and this prevented the endorsement of the change of beneficiary on the policy provided that the insured otherwise did all that he reasonably could do to strictly comply with the provisions of the policy. Here, since the insured sent no notice whatsoever of a change of beneficiaries to the insurance companies during her life, even under the general rule equity cannot give effect to any intention of the insured to change the beneficiaries for the reason that she did not do all that she reasonably could to meet the conditions of the policy.

Furthermore, it appears that the facts would not here justify any finding of an estoppel in pais against Union Trust Company. Union Trust Co. did not receive the instruction until October 21, 1960, when it also received the letter written by Mieras. The insured died 22 days later on November 12, 1960. In the meantime, there was correspondence between Mr. Cohoe, a trust officer of Union Trust Co. and Mieras, attorney for the insured who had mailed the letter and instruction of Oct. 19 to the Union Trust Co. It does not appear that the Union Trust Co. failed to exercise reasonable diligence in this matter in view of the circumstances. Thus on October 21, 1960, Mr. Cohoe replied to Mieras' letter pointing out the penalty ensuing with regard to the payment of premiums if the beneficiaries were changed, and enclosing a copy of the first three pages of the trust agreement. Then on October 24, 1960, Mieras wrote Union Trust that the insured still wished to proceed with the change and requesting that Union Trust make the beneficiary changes as quickly as possible. On October 26, 1960, Mr. Cohoe replied to Mieras' letter of the 24th and stated that Union Trust was submitting that day copies of all correspondence on this subject to the attorney for the Trust for

instruction as to procedures Union Trust must take under the circumstances. On November 1, 1960, Mr. Cohoe wrote Mieras that Union Trust would forward the policies along with the change of beneficiary forms to the insurance companies upon receipt of appropriate forms for change of beneficiary. In this letter of November 1, 1960, Mr. Cohoe wrote that Union Trust was advised in a legal opinion from the attorney representing it that the initiative in the matter of the change of beneficiary should be taken by Mrs. Laboshin, including the securing of the appropriate forms covering the change of beneficiary, the completion of the forms, etc., and that the forms should then be sent to Union Trust and, if Union Trust's consent is necessary, it should grant such consent and forward the policies along with the change of beneficiary forms to the respective companies with the request that the policies should be returned to Union Trust after the beneficiary has been changed.

In a letter to Union Trust dated November 3, 1960, Mr. Mieras stated that the local offices of the insurance companies informed him that the insurance policies must be submitted to the insurance companies with the request from the insured together with the name of the new beneficiary requested and all other necessary information, and that the insurance companies would then fill out the change of beneficiary forms themselves. Yet the very next day, November 4, 1960, Mr. Freeman, insurance advisor of Mrs. Laboshin, obtained the request for change of beneficiary forms from local offices of Prudential and local agents of New England Mutual. These requests for change of beneficiary forms appear to have been executed by Mrs. Laboshin on November 5, 1960, however, *neither request for change of beneficiary form was transmitted to Union Trust or to the insurance companies during the life of the insured,* but were placed in the safe of the Pasadena Christian School until after the death of Mrs. Laboshin.

On November 8, 1960, Union Trust sent Mieras a copy of a letter sent from Cohoe to Kooman, attorney representing the trust company, which asked for Kooman's legal opinion as to how to proceed in the premises.

On November 4, 1960, Freeman telephoned Mr. Cohoe and asked who was the owner of the insurance policies. Cohoe testified that he was "unable to answer that question". Freeman then telephoned to Mr. Kooman and asked the same question of Kooman. Kooman said: "I am not in a position to give you this answer."

It thus seems inferable that there was some uncertainty as to the ownership of the policies, and this uncertainty existed both with Union Trust Co. and with the advisers of Mrs. Laboshin in California. In view of this fact, and in view of the fact that the trust agreement itself may provide reasonable grounds for some uncertainty as to legal ownership of the policies, it cannot be said that Union Trust acted unreasonably in failing to forward the instruction and policies to the respective insurance companies prior to November 12, 1960.

Judgment will be entered for the claimants Carl H. Lauffer, individually and as guardian of the estate of Charles Henry Lauffer, a minor, Charles Henry Lauffer and Union Trust Company, in both actions. The attorney for the prevailing parties is directed to prepare, serve and lodge findings, conclusions and judgment pursuant to Rule 7 of the Rules of this Court, West's Ann.Code.